1  Timothy M. Freudenberger, State Bar No. 138257
   tfreud@cdflaborlaw.com
2  Alison L. Tsao, State Bar No. 198250
   atsao@cdflaborlaw.com
3  Kent J. Sprinkle, State Bar No. 226971
   ksprinkle@cdflaborlaw.com
4  CAROTHERS DISANTE & FREUDENBERGER LLP
   601 Montgomery Street
5  Suite 350
   San Francisco, California 94111
6  Telephone:  (415) 981-3233
   Facsimile:  (415) 981-3246
7
   Attorneys for Defendant
8  U.S. BANK NATIONAL ASSOCIATION

9           UNITED STATES DISTRICT COURT

10         NORTHERN DISTRICT OF CALIFORNIA

11                OAKLAND DIVISION

12  JERRY TRAHAN, individually and on behalf of  )   Case No. CV 09-3111 JSW
    other members of the general public similarly )
13  situated,                                     )   Assigned for All Purposes To:
                                                  )   Judge: JEFFREY S. WHITE
14            Plaintiff,                          )
       v.                                         )   **DEFENDANT U.S. BANK NATIONAL**
15                                                )   **ASSOCIATION'S MEMORANDUM OF**
    U.S. BANK NATIONAL ASSOCIATION, and           )   **POINTS AND AUTHORITIES IN**
16  DOES 1 through 50, inclusive,                 )   **SUPPORT OF ITS MOTION TO**
                                                  )   **DECERTIFY THE CLASS**
17            Defendant.                          )
                                                  )   Date:   October 17, 2014
18                                                )   Time:   9:00 a.m.
                                                  )   Dept:   5
19                                                )
                                                  )   Action Filed:  May 28, 2009
20  _____)   Trial Date:   February 16, 2016

21

22

23

24

25

26

27

28

849102.1

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ...................................................................................................... i

I.     INTRODUCTION ................................................................................................................ 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ......................................................... 1

       A.     Relationship With *Duran* .................................................................................... 1

       B.     Summary Of Evidence On Class Certification ...................................................... 2

              1.     BBOs Enter the Marketplace To Sell USB Products To Small
                     Businesses ................................................................................................... 2

              2.     USB Communicated Its Expectation That BBOs Work
                     Outside USB Branches ................................................................................ 3

              3.     BBOs Have Unfettered Discretion To Set Their Own
                     Schedules .................................................................................................... 3

              4.     BBOs Have Discretion To Implement Different Sales
                     Methods ....................................................................................................... 4

              5.     There Is No Typical BBO Workday Or Week ............................................. 5

              6.     USB's Measures To Reinforce The Outside Sales
                     Requirement ................................................................................................ 5

              7.     BBOs Use Discretion And Independent Judgment Working
                     With Customers ........................................................................................... 6

              8.     The BBO Compensation Structure Is Commission-Based ........................... 6

       C.     Plaintiff's Proposed Representative Sampling Trial Plan ...................................... 6

III.   PLAINTIFF BEARS THE BURDEN OF SATISFYING THE RULE 23
       REQUIREMENTS .............................................................................................................. 7

IV.    PLAINTIFF CANNOT ESTABLISH COMMONALITY AND
       PREDOMINANCE .............................................................................................................. 8

       A.     The Rule 23 Commonality And Predominance Requirements ............................... 8

       B.     USB's Three Exemption Defenses ........................................................................ 9

              1.     The Outside Sales Exemption ..................................................................... 9

              2.     The Administrative Exemption And Commission Sales
                     Exemption ................................................................................................... 9

849102.1

# TABLE OF CONTENTS (cont.)

**Page**

C.   Adjudicating These Exemptions Requires Individual Inquiries, Absent A Uniform Policy Or Practice Dictating How Employees Spend Their Time ................................................................... 10

    1.   *Duran* ................................................................... 10

    2.   Ninth Circuit Authorities ........................................... 11

D.   Plaintiff's "All-Or-Nothing" Theory Of The Case Fails Under California Law ........................................................... 12

E.   Plaintiff's Theory Of Class Treatment Is Unsupported By The Evidence ............................................................... 13

F.   Credibility Determinations Will Require Individual Inquiries ............... 14

G.   The Ancillary "Realistic Expectations" Question Generates Individualized Issues ..................................................... 15

H.   Administrative And Commission Sales Exemptions Require Individual Inquiries ..................................................... 16

V.   PLAINTIFF CANNOT MEET THE RULE 23(B)(3) MANAGEABILITY REQUIREMENT ................................................................. 17

A.   There Is No Way To Safeguard USB's Affirmative Defenses *And* Conduct A Class Trial ..................................................... 17

B.   Class Treatment Is Unmanageable Because Plaintiff Has No Common Evidence ........................................................ 20

VI.   CONCLUSION ................................................................. 20

849102.1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 623 (1997) ........................................................... 8

*Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004 (Cal. 2012) ...................... 14, 18, 19

*Campanelli v. Hershey*, 765 F.Supp.2d 1185 (N.D. Cal. 2011) ...................................... 9

*Dunbar v. Albertson's*, 141 Cal.App.4th 1422 (2006) ........................................................ 9

*Duran v. U.S. Bank NA*, 203 Cal.App.4th 212 (2012) ................................................. 1, 2

*Duran v. U.S. Bank NA*, 275 P.3d 1266 (Cal. 2012) ....................................................... 2

*Duran v. U.S. Bank NA*, 59 Cal.4th 1 (Cal. 2014) ................................................... passim

*Ellis v. Costco*, 657 F. 3d 970 (9th Cir. 2011) ............................................................. 7

*In re Paxil Litig.*, 212 F.R.D. 539 (C.D. Cal. 2003) .................................................... 18

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D 604 (N.D.Cal. 2010).......passim

*In re Wells Fargo*, 571 F.3d 953 (9th Cir. 2009).................................................. 11, 12

*Jimenez v. Domino's*, 238 F.R.D. 241 (C.D. Cal. 2006) ....................................... passim

*Keller v. Tuesday Morning*, 179 Cal.App.4th 1389 (2009) ........................................ 15

*Marlo v. UPS*, 251 F.R.D. 476 (C.D. Cal. 2008)..................................................... 7

*Marlo v. UPS*, 639 F.3d 942 (9th Cir. 2011) ................................................. 8, 9, 11, 12

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ................................... 8

*Muldrow v. Surrex Sol'ns*, 208 Cal.App.4th 1381 (2012) ........................................ 10

*Perry v. U.S. Bank*, 2001 WL 34920473 (N.D.Cal. Oct. 16, 2001) .............................. 16

*Perry-Roman v. AIG Ret. Servs.*, 2010 WL 8697061 (C.D. Cal. Feb. 24, 2010) .................. 11, 12

*Ramirez v. Yosemite Water Co.*, 20 Cal.4th 785 (Cal. 1999) .................................... 9

*Rea v. Michaels Stores*, 2014 WL 1921754 (C.D. Cal. May 8, 2014) ......................... 7, 11

*Rix v. Lockheed Martin*, 2011 WL 890744 (S.D.Cal. Mar. 14, 2011)............................ 16

*Sav-On v. Super. Ct.*, 34 Cal.4th 319 (Cal. 2004)............................................... 10

*Smith v. Bayer*, 131 S. Ct. 2368 (2011) ........................................................ 7

*Soderstedt v. CBIZ*, 187 Cal.App.4th 133 (2011)............................................... 16

1

**TABLE OF AUTHORITIES (cont.)**

2

**Page(s)**

3

*Spainhower v. U.S. Bank NA*, 2010 WL 1408105 (C.D. Cal. Mar. 25, 2010).......................... 11, 12

4

*Teamsters v. U.S.*, 431 U.S. 324 (1977) ........................................................................................ 18

5

*Vinole v. Countrywide*, 571 F.3d 935 (9th Cir. 2009) ............................................................ passim

6

*Wal-Mart v. Dukes*, 131 S. Ct. 2541 (2011) ......................................................................... 7, 8, 18

7

*Walsh v. Ikon Office Solutions*, 148 Cal.App.4th 1440 (2007)...................................................... 14

8

*Zinser v. Accufix Research*, 253 F.3d 1180 (9th Cir. 2001) ......................................................... 18

9

**Statutes**

10

Cal. Labor Code Section 1171.......................................................................................................... 9

11

Cal. Labor Code Section 510........................................................................................................ 9, 12

12

Cal. Labor Code Section 515........................................................................................................ 9, 12

13

**Other Authorities**

14

Federal Rule of Civil Procedure 23 ............................................................................................... 1, 8

15

8 Cal. Code of Regulations Section 11040................................................................................... 9, 10

16

Cal. DLSE Op. Ltr. 2003.05.23 ....................................................................................................... 9

17

18

19

20

21

22

23

24

25

26

27

28

# SUMMARY OF ARGUMENT

Now that this action is in federal court, Plaintiff must carry his burden of affirmatively demonstrating his compliance with the requirements of Rule 23.  He cannot do so.  No Rule 23 class should be certified because Plaintiff cannot satisfy the commonality, predominance, or manageability requirements of Rule 23.[1]

First, because BBOs have unfettered discretion to complete their job duties, the requisite commonality among the class members is lacking.  Plaintiff's theory that this case involves an "all-or-nothing proposition: either USB classified the BBO position properly or it did not," is belied by the law and the ample evidence that here, as in *Duran*, BBOs vary widely in how and where they perform their job duties.  *Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal.4th 1, 14 (2014).

Second, resolving USB's outside sales, administrative, and commission sales exemption defenses requires a predominance of individualized inquiries.  When analyzing such misclassification claims under Rule 23, Ninth Circuit courts uniformly hold that these exemptions cannot be resolved on a class basis in the total absence of common proof of uniform policies or practices dictating where and how employees complete their job duties.  *Vinole v. Countrywide*, 571 F.3d 935, 944 (9th Cir. 2009); *In re Wells Fargo*, 571 F.3d 953 (9th Cir. 2009); *In re Wells Fargo Overtime Litig.*, 268 F.R.D 604, 611 (N.D.Cal. 2010).  In *Duran*, the California Supreme Court reaches this conclusion as to USB's BBO position in particular.  *Duran*, 59 Cal. 4th at 14.

Finally, as Plaintiff's failed survey proposal illustrates, there is no way to conduct a manageable class trial here.  Plaintiff cannot propose any statistically sound way to select a Representative Witness Group, nor can any trial in which testimony is limited to such a group adequately protect USB's due process right to present its affirmative defenses, which hinge on individual inquiries into where and how BBOs perform their job duties.

---

[1] Per the Court's July 29, 2014 Order (ECF 134), USB limits its arguments herein to the Rule 23 commonality, predominance, and manageability requirements.  USB believes it has compelling arguments regarding the adequacy of class counsel, particularly in view of existing and potential conflicts of interest raised by class counsel's prior representation of the class in *Duran*, and the continued attempt to represent the decertified *Duran* class.  If the Court deems it necessary to hear further argument on the remaining Rule 23 requirements to reach its decision on decertification, USB respectfully requests leave to file papers on those additional requirements.

# I.  **INTRODUCTION**

No Rule 23 class should be certified because Plaintiff cannot satisfy the commonality, predominance, or manageability requirements of Rule 23.  First, because BBOs have unfettered discretion to complete their job duties however and wherever they choose, the requisite commonality among the class members is lacking.  Plaintiff's theory that this case involves an "all-or-nothing proposition: either USB classified the BBO position properly or it did not," is belied by the law and the ample evidence that here, as in *Duran*, BBOs vary widely in how and where they perform their job duties.  Second, common questions do not predominate over individual ones, because resolving USB's outside sales, administrative, and commission sales exemption defenses require individualized inquiries into each BBO's activities.  When analyzing misclassification claims like this one under Rule 23, Ninth Circuit courts have uniformly held that the outside sales and administrative exemptions cannot be resolved on a class basis in the total absence of common proof of uniform policies or practices dictating where and how employees complete their job duties.  The California Supreme Court reached the same conclusion in *Duran*, not only as a general rule, but as to USB's BBO position in particular.  Third, there is no way to conduct a manageable class trial here.  Plaintiff cannot propose any statistically sound way to select a Representative Witness Group, nor can any trial in which testimony is limited to such a group adequately protect USB's due process right to present its affirmative defenses, which hinge on individual inquiries into where and how BBOs perform their job duties.  These three reasons demonstrate that a Rule 23(b)(3) class should not be certified here, and USB's motion for decertification should be granted.

# II.  **FACTUAL AND PROCEDURAL BACKGROUND**

Because the Court is familiar with the lengthy procedural history here, USB highlights background directly affecting this motion, including (1) the relationship between this action and *Duran*, (2) the parties' evidence on class certification, and (3) Plaintiff's proposed trial plan.

## A.  **Relationship With *Duran***

In moving to certify the class, Plaintiff accurately characterized this action as "a continuation of *Duran*" as it involves the same Defendant (USB) and job title (BBO), and was filed shortly after the trial court entered judgment in *Duran*, alleging a proposed class period starting one

1  day after the end of the *Duran* class period. Class Cert Mot. (ECF 68-15, pp. 102-120) at 1.

2  Plaintiff alleges that "[t]he general duties, responsibilities and compensation structure of the

3  [BBOs] have not changed in a material way" since the start of the *Duran* class period." FAC, ¶13.

4      *Duran* moved through the appellate courts while this action progressed in state court,

5  providing at times inconsistent guidance for this action. For example, Plaintiff relied on the *Duran*

6  trial plan and trial transcript in moving for class certification in January 2012. Pltf's Class Cert.

7  Mot. at 1:9-10 (ECF 68-15). Less than a month later, the California Court of Appeal reversed the

8  *Duran* judgment, decertified the class, and rejected the *Duran* trial plan. *Duran v. U.S. Bank NA*,

9  203 Cal.App.4th 212 (2012). Shortly before the state court granted certification in this action, the

10  California Supreme Court granted review in *Duran*. 275 P.3d 1266 (Cal. 2012). Thus, in

11  certifying the class in August 2012, the state court refused to consider *Duran* because it was not

12  citable. 8/28/12 Cert. Order at 4:11-13, 13:15-17 (ECF 70, pp. 89-111, 70-1, pp. 1-20). Nearly two

13  years later, on May 29, 2014, the California Supreme Court issued its decision in *Duran*, affirming

14  the Court of Appeal's decision in all respects and decertifying the *Duran* class. 59 Cal.4th at 50.

15  **B.    Summary Of Evidence On Class Certification**

16      **1.    BBOs Enter the Marketplace To Sell USB Products To Small Businesses.**

17      BBOs create and execute individual sales strategies for financial products, including loans

18  and lines of credit, to small business owners.[2] To do so, BBOs meet prospective and existing

19  customers at their places of business, network in the community, and seek referral sources, such as

20  accountants and lawyers – all of which require BBOs to work outside of USB premises.[3] BBOs are

21

22  [2] T. Ghali Decl., Ex. M (2005 Job Descr.) (all "Ex." citations refer to exhibits to the Ghali
    Declaration unless otherwise noted); *see also, e.g.*, Birnbryer, A. ¶5; Brandt, K. ¶¶4, 12; Carreon,
23  C. ¶¶8, 11; Dias, S. ¶¶5, 16; Hwang, Y. ¶5; Jeske, K. ¶12; Jimenez, A. ¶¶6, 13; John, H. ¶¶4, 8;
    Klingman, J. (10/27/09) ¶6; Lufti, M. ¶¶5, 15; Maier, W. ¶¶3, 6; Moulton, C. ¶6; Racusin, E. ¶3;
24  Reed, G. ¶4; Summers, R. ¶3; Tamblyn, P. ¶5; Tobes, A. ¶6; Weimer, G. ¶¶2-3; Ex. H (Lo, S.)
    25:22-26:9; Ex. I (Feinner, D.) 51:9-19; Ex. J (Jackson, J.) 76:12-22, 100:12-18; Ex. F (Trahan, J.)
25  77:20-78:10.
    [3] *See, e.g.*, Ex. M (2005 Job Descr.); Biggs, T. ¶3; Birnbryer, A. ¶¶8, 15; Brandt, K. ¶5; Carreon, C.
26  ¶¶9, 11; Dias, S. ¶7; Jeske, K. ¶¶6, 10; Jimenez, A. ¶¶6, 11; John, H. ¶¶5, 7, 9; Lufti, M. ¶15;
    Maier, W. ¶¶8-10; Moulton, C. ¶¶10, 12; Pai, J. ¶¶8, 9; Pizarroso, S. ¶¶5, 6, 10; Racusin, E. ¶¶9-11;
27  Reed, G. ¶¶4, 7; Summers, R. ¶¶ 5-6, 9-10, 13; Tobes, A. ¶¶13-16; Weimer, G. ¶¶7, 12; Ex. J
    (Jackson, J. ) 102:2-103:12, 112:4-10, 129:14-130:24, 175:2-176:12; Ex. F (Trahan, J.) 134:11-
28  135:10, 136:15-138:6; Ex. L (Watkins, M.) 109:23-110:9, 142:1-143:12.

Case No.  CV 09-3111 JSW
MPAs ISO DEF.'s MTN TO DECERTIFY
CLASS

849102.1

1   expected to spend 80% of their time on these "outside sales activities." Ex. M. Within these

2   parameters, the BBO position is an entrepreneurial one, rather than a "desk" job. Jeske, K. ¶3;

3   Moulton, C. ¶3. BBOs are encouraged to think of themselves as small business owners and, as

4   such, have unfettered discretion over their schedules, so long as they meet their sales goals. Biggs,

5   T. ¶20. BBOs work with a wide variety of small business clients, from pet stores to computer chip

6   manufacturers, and they must understand the relative complexity of each borrower's business and

7   perform financial analyses for these customers of corresponding complexity. Biggs, T. ¶12.

8         2.   **USB Communicated Its Expectation That BBOs Work Outside USB Branches.**

9         USB has consistently emphasized that BBOs must spend their time in the community and at

10  their customers' place of business. The BBO job description dated May 2005 made clear that

11  BBOs should spend more than 80% of their time on "outside sales," including "consult[ing] with

12  customers and prospects at their place of business," and "represent[ing] the bank at various civic

13  and community functions." Ex. M. These "outside sales" expectations specifically referred to

14  being physically outside of any USB property, in the marketplace, because of the importance of

15  canvassing and networking with potential customers at their places of business and in the

16  community. Wheaton, C. (3/30/12) ¶4 . Several BBOs have testified that they were advised as

17  early as their interviews of this expectation.[4] Moreover, consistent with this expectation that BBOs

18  spend most of their time outside USB locations, USB's managers coached and counseled BBOs

19  who failed to meet this requirement throughout the class period.[5]

20        3.   **BBOs Have Unfettered Discretion To Set Their Own Schedules.**

21        BBOs set their own schedules and select their own marketing strategies and sales plans to

22  achieve their sales goals and desired levels of compensation. They are largely unsupervised and

23  come and go as they please.[6] Some BBOs delegate work to assistants or other branch personnel

24

_____

25  [4] Birnbryer, A. ¶2; Carreon, C. ¶4; Jimenez, A. ¶4; Moulton, C. ¶3; Tamblyn, P. ¶8; Tobes, A. ¶17.
    [5] Ex. A (Biggs, T.) 165:4-23, 185:21-186:21; Ex. C (Gediman, M.) 134:6-135:24; Ex. D
26  (MacClelland, S.) 103:11-104:2, 130:3-17; Biggs, T. ¶21; Catton, J. ¶5; Dampier, C. ¶¶ 8-10, 16;
    Gediman, M. ¶¶6, 10, 16-17, 19-20, 22; Ex. D (MacClelland, S.) 135:19-136:3; Shih, M. ¶6;
    Wheaton, C. (3/30/12) ¶¶5, 10-12, 15; Wheaton, C. (11/8/10) ¶¶7,12-13; Ure, T. ¶¶6-7.
27  [6] *See, e.g.*, Birnbryer, A. ¶¶2, 5-10 12, 20; Brandt, K. ¶¶4, 13-14, 17-18; Carreon, C. ¶¶11-13, 15-
    16; Dias, S. ¶¶5, 17, 19; Hwang, Y. ¶¶6-7; Jeske, K. ¶¶3-5, 7, 11, 15-16; Jimenez, A. (11/6/09)
28

_____

849102.1

1   and train other BBOs.[7]  Because BBOs report to different Sales Managers and are assigned

2   different geographic regions,[8] they spend varying amounts of time outside USB locations each day

3   or week: travel and meet with customers/prospects; network with referral sources; and work at

4   home to prepare for sales meetings, prepare marketing materials, and prepare loan applications.[9]

5   BBOs have no knowledge of how much time other BBOs spend on outside sales.[10]

6   **4.    BBOs Have Discretion To Implement Different Sales Methods.**

7   BBOs have the freedom to explore different methods for completing sales, and they develop

8   those strategies that will work for them, based on their geographic location, personal networks,

9   target customers, or personal preferences.[11]  For example, some BBOs choose to target networking

10

---

11  ¶¶10, 15-17; John, H. ¶¶9, 14-15, 18-19; Klingman, J. (10/27/09) ¶¶3, 7, 9-10, 13-14; Lufti, M.
    ¶¶5, 16, 18; Maier, W. ¶¶12, 14-16, 19-20; Moulton, C. ¶¶11, 14, 16-17, 20-21; Pai, J. ¶¶4-6, 13-
12  14; Pizarroso, S. ¶¶4, 10-11, 13-14; Racusin, E. ¶¶6, 12-15; Reed, G. ¶¶7, 9, 11-12; Summers, R.
    ¶¶11, 13-15; Tamblyn, P. ¶¶5, 16, 18; Tobes, A. ¶¶19, 20; Weimer, G. ¶¶8, 13, 15-16, 19-20; Ex. H
13  (Lo, S.) 93:2-10, 109:24-111:13; Ex. I (Feinner, D.) 67:23-68:4, 68:15-25, 71:11-19, 124:17-125:8;
    Ex. K (Klingman, J.) 38:21-39:23, 42:4-22, 92:15-94:15, 101:15-105:17, 109:4-17, 119:7-120:2l;,
14  120:16-122:22; Ex. F (Trahan, J.) 147:25-150:2, 151:6-12, 152:10-17, 156:7-18, 157:24-159:24,
    168:8-169:2; Ex. L (Watkins, M.) 72:9-74:7, 87:11-25, 111:2-16, 166:8-19, 175:8-17; Wheaton, C.
15  (3/30/12) ¶10; Esposito, F. ¶9; Rukhman, D. ¶7; Biggs, T. ¶20.
    [7] *See, e.g.*, Brandt, K. ¶4; Dias, S. ¶20; Hwang, Y. ¶¶8, 14; Jimenez, A. (11/6/09) ¶¶5, 13; John, H.
16  ¶12; Lufti, M. ¶19; Moulton, C. ¶19; Summers, R. ¶11; Ex. H (Lo, S.) 32:19-34:8; Ex. I (Feinner,
    D.) 51:20-52:1, 80:19-81:16; Ex. J (Jackson, J.) 88:8-24; Ex. K (Klingman, J.) 58:8-60:5, 126:11-
17  127:8; Ex. L (Watkins, M.) 153:20-154:5.
    [8] *See, e.g.*, Birnbryer, A. ¶4; Brandt, K. ¶1; Carreon, C. ¶9; Jeske, K. ¶13; Pai, J. ¶3; Pizarroso, S.
18  ¶3; Racusin, E. ¶2; Reed, G. ¶3; Tamblyn, P. ¶2; Tobes, A. ¶7; Weimer, G. ¶1; Ex. H (Lo, S.) 33:4-
    33:21, 53:14-18; Ex. I (Feinner, D.) 75:25-76:20; Ex. J (Jackson, J.) 77:21-79:1; Ex. K (Klingman,
19  J.) 50:23-51:6; Ex. E (Pham, T.) 37:21-38:10; Ex. L (Watkins, M.) 31:16-20, 32:18-33:11
    (collectively demonstrating variation in branches, regions, and cities BBOs support).
20  [9] *E.g.*, Birnbryer, A. ¶¶8, 15-19; Brandt, K. ¶5; Carreon, C. ¶¶9, 11; Dias, S. ¶7; Jeske, K. ¶¶6, 10;
    Jimenez, A. ¶¶6, 11, 14; John, H. ¶¶5, 7, 9; Lufti, M. ¶15; Maier, W. ¶¶7-10; Moulton, C. ¶¶9-10,
21  12, 18; Pai, J. ¶¶8, 9; Pizarroso, S. ¶¶5, 6, 8, 10; Racusin, E. ¶¶9-11; Reed, G. ¶¶4, 5, 7; Summers,
    R. ¶¶ 5-6, 9-10, 13; Tobes, A. ¶¶13-17; Weimer, G. ¶¶4, 7, 12; Ex. H (Lo, S.) 64:2-7, 65:2-66:21,
22  102:8-16, 103:19-104:6; Ex. I (Feinner, D.) 99:4-100:7, 107:18-24, 108:8-17, 109:5-110:7, 110:19-
    111:7, 113:16-21, 141:8-20; Ex. J (Jackson, J.) 102:8-103:12, 112:4-10, 129:14-130:24, 140:5-20,
23  155:15-156:10, 157:1-11, 171:9-173:18, 175:2-176:12; Ex. K (Klingman, J.) 52:16-17, 142:20-
    143:13; Ex. E (Pham, T.) 31:14-17, 32:21-33:11, 37:8-16, 54:2-9, 56:24:1-9, 117:6-13, 123:17-
24  124:4, 131:7-132:6, 133:17-134:10, 156:2-23; Ex. F (Trahan, J.) 98:9-99:1, 134:11-135:10, 136:15-
    138:6, 162:7-163:10; Ex. L (Watkins, M.) 109:23-110:9, 137:19-138:14; 142:1-143:12.
25  [10] *See, e.g.*, Birnbryer, A. ¶21; Brandt, K. ¶16; Carreon, C. ¶17; Dias, S. ¶21; Jeske, W. ¶14;
    Jimenez, A. (11/06/09) ¶18; John, H. ¶17; Lufti, M. ¶20; Maier, W. ¶18; Moulton, C. ¶22; Pai, J.
26  ¶15; Pizarroso, S. ¶12; Racusin, E. ¶16; Reed, G. ¶10; Summers, R. ¶16; Tamblyn, P. ¶19; Tobes,
    A. ¶21; Ex. H (Lo, S.) 171:4-7; Ex. I (Feinner, D.) 121:8-16, 128:11-129:1; Ex. K (Klingman, J.)
27  248:6-21; Ex. F (Trahan, J.) 150:3-151:5, 155:16-18, 197:2-20; Ex. L (Watkins, M.) 156:24-157:2.
    [11] *See, e.g.*, Dias, S. ¶5; Hwang, Y. ¶6; Jimenez, A. ¶10, Pai, J. ¶6; Racusin, E. ¶12; Weimer, G.
28

---

849102.1

1   events (*e.g.*, Dias, S. ¶7), or "prospect" at businesses by dropping in unannounced (*e.g.*, Reed, G.

2   ¶7; Weimer, G. ¶7), whereas others choose to utilize branch staff to disseminate flyers (*e.g.*,

3   Hwang, Y. ¶8).  BBOs are free to develop their own target businesses, from churches (*e.g.*,

4   Jimenez, A. ¶10) to medical professionals (*e.g.*, Dias, S. ¶7; Pai, J. ¶6). They develop expertise to

5   reach their target market within the geographic region where they are assigned.  *See* Ex. G

6   (Birnbryer, A.) at 66:11-23 (Marin had more high net worth individuals than industrial,

7   manufacturing areas).  Moreover, different USB managers encourage BBOs under their supervision

8   to solicit sales in different ways.  *Cf.*, Epton, T. ¶¶10-11 and Gediman, M. ¶¶4-7.

9       **5.       There Is No Typical BBO Workday Or Week.**

10      There is no "typical" BBO work day; BBO schedules vary by person and by day.[12]  The

11  amount of time a BBO spends working varies day to day, week to week, and at various points

12  during the fiscal year.[13]  While Plaintiff's declarants uniformly testified that they work over 40

13  hours a week, other declarants rarely worked overtime.[14]

14      **6.       USB's Measures To Reinforce The Outside Sales Requirement.**

15      As Plaintiff concedes, the material duties of the BBO position have not changed since the

16  *Duran* class period.  FAC ¶13.  Indeed, the outside sales requirement has been a key component of

17  the BBO position throughout, as shown in the 2005 BBO Job Description.  Ex. M.  On June 30,

18  2009, USB issued a slightly revised job description, with an addendum reiterating that California

19  BBOs must spend a majority of their time working away from USB's premises.  Ex. N.

20      During the class period, USB provided BBOs with resources including cell phone

21  reimbursement, laptops, and in some regions, sales assistants, to help them work remotely.  Biggs,

22  T. ¶¶7, 22-27.  In January 2010, after the end of the class period, USB introduced other

---

24  ¶13; Ex. J (Jackson J.) 76:12-19.

25  [12] *See, e.g.*, Birnbryer, A. ¶¶ 12, 13; Carreon, C. ¶11; Hwang, Y. ¶7; Jeske, K. ¶6; Jimenez, A. (11/6/09) ¶15; John, H. ¶¶ 5, 7; Klingman, J. (10/27/09) ¶9; Maier, W. ¶7; Moulton, C. ¶18; Racusin, E. ¶11; Summers, R. ¶6; Tobes, A. ¶¶ 16, 17, 18; Weimer, G. ¶5.

26  [13] *See, e.g.*, Jimenez, A. (11/6/09) ¶15 ; Klingman, J. (10/27/09) ¶10; Tobes, A. ¶18; Ex. H (Lo, S.) 65:10-66:18, 71:9-72:19; Ex. I (Feinner, D.) 73:13-21; Ex. F (Trahan, J.) 154:22-155:3; Ex. L (Watkins, M.) 159:15-160:5, 168:19-169:6, 170:20-172:22.

27  [14] *See, e.g.*, Bahadorani, N. ¶¶10, 16; Rukhman, D. ¶16; Lufti, M. ¶16; Vanderford, B. ¶11.

28

Case No.  CV 09-3111 JSW
MPAs ISO DEF.'s MTN TO DECERTIFY
CLASS

849102.1

1  technological improvements to improve remote access and implemented a quarterly certification

2  program verifying whether BBOs spend over 50% of their time outside USB locations.[15]

3  **7.  BBOs Use Discretion And Independent Judgment Working With Customers.**

4  To succeed, BBOs must have an in-depth understanding of business cycles and proficiency

5  in reading financial reports, business operating reports, business forecasts, and cash flow analyses.

6  BBOs evaluate collateral and repayment sources, perform profitability yield analyses, and assess

7  risk factors.  They exercise discretion and independent judgment to identify and recommend

8  appropriate products to customers, vary loan terms and conditions within parameters, prepare

9  analyses regarding loans to the Underwriting Department, and appeal decisions by the

10  Underwriting Department where appropriate.[16]  BBOs are expected to conduct financial analysis

11  for each of their customers by developing an in-depth understanding of each customer's financial

12  situation in order to evaluate the opportunities and risks for the Bank posed by the customer and to

13  advise the customer regarding appropriate products.  Biggs, T. ¶8.

14  **8.  The BBO Compensation Structure Is Commission-Based.**

15  In addition to a base salary (generally $60,000-$80,000 annually), BBOs receive

16  commissions under Sales Incentive Plans ("SIP") on products they sell.  Ex. B (Coonley, J.) at

17  54:2-8, 103:19-104:5, Tsao Dec. Ex. B (2007 & 2008 SIPs); Hinrichsen, K. ¶2, Exhs. A-C (2005,

18  2006, & 2009 SIPs) (filed under seal).  Because the SIPs are uncapped, BBOs have unlimited

19  potential to earn lucrative commissions, and many BBOs regularly earn more in commissions than

20  their base pay, bringing their annual compensation over $100,000.  Hinrichsen, K. ¶4, Exhs. A-C.

21  **C.  Plaintiff's Proposed Representative Sampling Trial Plan.**

22  Before certifying the class, the state court did not require Plaintiff to submit a workable trial

23

24  [15] Biggs, T. ¶¶ 16, 26-7; Catton, J. ¶7; Corral, S. ¶8; Hwang, Y. ¶11; Pai, J. ¶12; Rukhman, D. ¶17; Shih, M. ¶8; Wheaton, C. (3/30/12) ¶5; Ex. P, Ex. Q.

25  [16] Biggs, T. ¶8; Birnbryer, A. ¶¶5, 10, 14; Brandt, K. ¶¶ 7, 8, 10-11; Carreon, C. ¶14; Dias, S. ¶¶6, 9-10, 12-15; Hwang, Y. ¶¶5-6; Jeske, K. ¶¶7-9; Jimenez, A. (11/6/09) ¶12 ; John, H. ¶¶ 4, 6, 10, 13,

26  15; Lufti, M. ¶¶6, 9, 11-14; Maier, W. ¶¶3-5, 11, 14, 17; Moulton, C. ¶¶14-15; Pai, J. ¶6; Pizarroso, S. ¶¶4, 6-7; Racusin, E. ¶¶3-4, 6; Reed, G. ¶4; Summers, R. ¶3; Tamblyn, P. ¶¶ 6, 10-15; Tobes, A. ¶¶11-12, 19; Weimer, G. ¶¶8, 10, 17; Ex. H (Lo, S.) 26:10-20, 30:7-24, 51:14-52:3, 88:6-16,

27  112:25-114:5; Ex. I (Feinner, D.) 93:6-14; Ex. K (Klingman, J.) 257:14-24, 258:3-260:3; Ex. F (Trahan, J.) 54:24-58:5, 193:14-22, 195:17-23; 202:24-203:17; Watkins, M. Depo 106:21-107:4.

28

849102.1

plan. Plaintiff argued that the case could be tried using the *Duran* trial plan. Class Cert. Mot. (ECF 68-15, pp.102-120) at 25. Plaintiff's trial plan, submitted for the first time nearly a year after class certification, outlines three phases: (1) an initial "liability" phase to determine "whether USB has improperly classified the BBO position as exempt" based on testimony from a restricted sample of testifying BBOs, (2) a "damages" phase to determine hours worked, and (3) a "remedial" phase for "claims processing" to determine individual recovery. Pltf's Discovery & Trial Plan (ECF 116-1, pp. 20-41) at 5-11 (limiting discovery to sample of "Representative Trial Witnesses").

Plaintiff originally proposed selecting the sample size based on a confidential survey conducted by his statistics expert, but the Court has rejected Plaintiff's survey proposal. 7/29/14 Order (ECF 134); 8/18/14 Order (ECF 139). Plaintiff has presented no alternative trial plan.

## III. PLAINTIFF BEARS THE BURDEN OF SATISFYING THE RULE 23 REQUIREMENTS.

Decertification is appropriate when upon further examination or additional evidence, it becomes clear that class treatment is improper. *Marlo v. UPS*, 251 F.R.D. 476, 479-80 (C.D. Cal. 2008) ("*Marlo I*"). In deciding whether to decertify, a court may consider "subsequent developments in the litigation," including "previous substantive rulings in the context of the history of the case, and ... the nature and range of proof necessary to establish the class-wide allegations." *Marlo I*, 251 F.R.D. at 479; *Ellis v. Costco*, 657 F. 3d 970, 981 (9th Cir. 2011) ("[I]t is not correct to say a district court *may* consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits if they overlap with the Rule 23(a) requirements."); *Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (Rule 23 "rigorous analysis" will "[f]requently ... entail some overlap with the merits of the plaintiff's underlying claim").

Where, as here, Plaintiff has never satisfied the requirements of Rule 23, arguably no Rule 23 class exists at all. *Rea v. Michaels Stores*, 2014 WL 1921754, *1 (C.D. Cal. May 8, 2014) (refusing to certify a Rule 23 class, or alternatively, decertifying the class previously certified by the state court); *Smith v. Bayer*, 131 S. Ct. 2368, 2380 (2011) (absent Rule 23 certification, "we cannot say that a properly conducted class action existed at any time in the litigation. Federal Rule 23 determines what is and is not a class action in federal court.[]"). In any event, the standard on

849102.1

1  decertification is the same as on certification:  a plaintiff must survive the court's "rigorous

2  analysis" and "must affirmatively demonstrate" his compliance with the requirements of Rule 23.

3  *Dukes*, 131 S.Ct. at 2551-52; *Marlo v. UPS*, 639 F.3d 942, 947-48 (9th Cir. 2011) ("*Marlo II*") (in

4  decertifying class, "[t]he district court ... properly placed the burden on [the plaintiff] to

5  demonstrate that Rule 23's class-certification requirements had been met").

6  **IV.  PLAINTIFF CANNOT ESTABLISH COMMONALITY AND PREDOMINANCE.**

7        Because the BBO position is not standardized, there is no way to resolve USB's exemption

8  defenses in "one stroke."  And what limited commonality exists here is overwhelmed by the need

9  for individualized inquiries about where and how BBOs spend their time.  As the Ninth Circuit and

10  the California Supreme Court have recognized, where, as here, no uniform policy or practice

11  dictates where BBOs spend their time, individual inquiries predominate.

12  **A.        The Rule 23 Commonality And Predominance Requirements.**

13        Under the Rule 23(b)(2) commonality requirement, Plaintiff must prove that his class

14  claims "'depend on a common contention,' such that 'determination of its truth or falsity will

15  resolve an issue that is central to the validity of each [claim] in *one stroke*.'"  *Mazza v. Am. Honda*

16  *Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Dukes*, 131 S.Ct. at 2555) (emphasis added).

17  "What matters to class certification . . . is not the raising of common 'questions'—even in droves—

18  but rather the capacity of a classwide proceeding to generate common *answers* apt to drive the

19  resolution of the litigation."  *Dukes*, 131 S. Ct. at 2551 (original emphasis).

20        The Rule 23(b)(3) predominance requirement presents a related, but "much more rigorous"

21  analysis that "tests whether proposed classes are sufficiently cohesive to warrant adjudication by

22  representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 623-24 (1997); *Vinole v. Countrywide*,

23  571 F.3d 935, 944 (9th Cir. 2009); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D.

24  604, 612 (N.D.Cal. 2010) (*Wells Fargo II*) ("The important inquiry is not whether common issues

25  predominate with respect to plaintiff's prima facie case, but rather will common issues predominate

26  in the entire litigation").  "A central concern of the Rule 23(b)(3) predominance test is whether

27  adjudication of common issues will help achieve judicial economy."  *Vinole*, 571 F.3d at 944.

28  Efficiency and judicial economy are defeated where, as here, resolving exemption defenses would

1  require "mini-trials with respect to each [class member's] actual work performance."  *Id.* at 947.

2  **B.**   **USB's Three Exemption Defenses: Outside Sales, Administrative, Commission Sales.**

3  California law requires payment of overtime to an employee who (1) worked overtime

4  hours and (2) did not perform duties rendering him exempt from the overtime requirements.  Labor

5  Code §§510(a), 515(a), (e).  Three separate exemptions apply to BBOs: (1) outside sales; (2)

6  administrative; and (3) commission sales.  Evaluating whether an individual BBO falls under one

7  or more of these exemptions requires an individualized, week-by-week analysis.  *Marlo II*, 639

8  F.3d at 948 (citing *Dunbar v. Albertson's*, 141 Cal.App.4th 1422, 1427 (2006)).  Moreover, time

9  spent on exempt duties may be "tacked."  DLSE Op. Ltr. 2003.05.23, p.5, *Campanelli v. Hershey*,

10  765 F.Supp.2d 1185, 1197, n.22 (N.D. Cal. 2011) (acknowledging California's "combination"

11  exemption).   Thus, determining liability here requires an assessment of whether each BBO spends

12  a majority of work time performing one *or more* of these exemptions, cumulatively.

13  **1.   The Outside Sales Exemption**

14  USB's mainly relies on the outside sales exemption, which applies to persons "who

15  customarily and regularly work[] more than half the working time away from the employer's place

16  of business selling tangible or intangible items or obtaining orders or contracts for products,

17  services, or use of facilities."  Wage Order 4-2001, Cal. Code Regs. ("CCR"), tit. 8, §110401(C),

18  2(M); Labor Code §1171.  When evaluating this exemption, "[t]he trial court must inquire 'first

19  and foremost, how the employee *actually* spends his or her time.'"  *Duran*, 59 Cal.4th at 26 (citing

20  *Ramirez v. Yosemite Water Co.*, 20 Cal.4th 785, 802 (1999)) (emphasis in *Duran*).  Questions of

21  "whether the employee's practice diverges from the employer's realistic expectations," are

22  ancillary.  *Id.*  Thus, "litigation of the outside salesperson exemption has the obvious potential to

23  generate individual issues because the primary considerations are how and where the employee

24  actually spends his or her workday."  *Id.* at 27.  Simply put, "[g]iven California's uniquely

25  quantitative approach to [the outside sales] exemption, some proof about how individual employees

26  use their time will often be necessary to accurately determine an employer's overtime liability."  *Id.*

27  **2.   The Administrative Exemption And Commission Sales Exemption**

28  The administrative and commission sales exemptions apply here because BBOs perform

Case No.  CV 09-3111 JSW
MPAs ISO DEF.'s MTN TO DECERTIFY
CLASS

849102.1

administratively exempt duties on behalf of USB and its customers, and they receive incentive pay for their work. An employee is administratively exempt if he: (1) primarily (more than half the time) has duties involving "the performance of office or non-manual work directly related to management policies or business operations of the employer or the employer's customers"; and (2) customarily and regularly exercises discretion and independent judgment. 8 CCR §11040(1)(A)(2) & (2)(N). The commission sales exemption applies to an employee "whose earnings exceed one and one-half (1½) times the minimum wage if more than half of that employee's compensation represents commissions." 8 CCR §11040(3)(D); *Muldrow v. Surrex Sol'ns*, 208 Cal.App.4th 1381, 1384 (2012). Under the commission sales exemption, a compensation plan pays "commissions" if compensation is "sufficiently related to the price of services sold." *Id.*

## C. Adjudicating These Exemptions Requires Individual Inquiries, Absent A Uniform Policy Or Practice Dictating How Employees Spend Their Time.

Plaintiff has never shown that he can satisfy the rigorous analysis required under Rule 23. As *Duran* and the controlling Ninth Circuit authorities make clear, Plaintiff cannot do so.

### 1. *Duran*

"Unless an employer's uniform policy or consistent practice violates wage and hour laws, California courts have been reluctant to certify class actions alleging misclassification." *Duran*, 59 Cal.4th at 30-31. The reason for this reluctance is simple: misclassification cases under California law typically hinge on exemption defenses that demand individual inquiries about employees' actual activities -- unless class-wide policies or practices "result in employees uniformly spending most of their time on nonexempt work." *Id.* at 27 (citing *Sav-On v. Super. Ct.*, 34 Cal.4th 319, 327-28 (2004)). Because the employee's *actual* activities govern, *Duran* recognizes that the existence of a determinative uniform policy or practice is the *only* scenario in which a misclassification action may be decided on a class-wide basis:

> This is not to say that an employer's liability for misclassification may never be decided on a class basis. A class action trial may determine that an employer is liable to an entire class for misclassification *if it is shown that the employer had a consistently applied policy or uniform job requirements and expectations contrary to a Labor Code exemption, or if it knowingly encouraged uniform de facto practice inconsistent with the exemption.*

*Duran*, 59 Cal.4th at 37 (emphasis added).

849102.1

### 2.  **Ninth Circuit Authorities**

*Duran* aligns itself with Ninth Circuit authorities uniformly holding that class treatment is inappropriate when adjudicating exemptions that require individualized analyses of employees' actual activities.  *In re Wells Fargo*, 571 F.3d 953 (9th Cir. 2009) (*Wells Fargo I*); *Wells Fargo II*, 268 F.R.D. at 611 (in adjudicating outside sales exemption, "unless plaintiff proposes some form of common proof, such as a standard policy governing how and where employees perform their jobs, common issues of law or fact are unlikely to predominate"); *Vinole*, 571 F.3d at 947; *Marlo II*, 639 F.3d at 947-48 (plaintiff failed to provide common proof to support a class-wide liability finding). Following these binding decisions*,* district courts have rejected class adjudication of exemption defenses that require individualized inquiries.  *Spainhower v. U.S. Bank NA*, 2010 WL 1408105, *3-4 (C.D. Cal. Mar. 25, 2010); *Rea*, 2014 WL 1921754 at *4 (evaluating executive exemption "would necessarily devolve into individual mini-trials regarding whether each particular class member actually met the requirements for exempt status."); *Jimenez v. Domino's*, 238 F.R.D. 241, 252 (C.D. Cal. 2006) ("the predominating issue in this [executive exemption] case is the actual mix of duties worked which entails a need to conduct an individual inquiry for each class member").

General policies and practices do not satisfy the commonality and predominance requirements when they leave an abundance of individual questions on the table.  *Wells Fargo II*, 268 F.R.D. at 611 (while mortgage consultants shared "common job descriptions, uniform training, the same primary goal (to sell mortgages), uniform job expectations, similar compensation plans, and standardized employee evaluation standards," such common proof did not resolve the critical question of how each class member actually spent work time); *Perry-Roman v. AIG Ret. Servs.*, 2010 WL 8697061 (C.D. Cal. Feb. 24, 2010) (although financial advisors had same six tasks, the manner in which they completed those tasks varied and required individual proof); *see also Marlo II* at 959 (although uniform policies requiring employees "to follow certain procedures or perform certain tasks"  showed employer expectations of employees' tasks, individual questions persisted as to whether employees "actually are 'primarily engaged' in exempt activities during the course of the work week" or "customarily and regularly exercis[ing] discretion and independent judgment").

Moreover, where employees have discretion to set their schedules, as BBOs do, exemptions

849102.1

are likely to be overrun with individual inquiries.  *Wells Fargo II*, 268 F.R.D. at 611 (mortgage consultants operated without supervision); *Vinole*, 571 F.3d at 947 (individual consultants had "almost unfettered autonomy"); *Spainhower*, 2010 WL 1408105 at *3-4 (in-store bank managers' misclassification claims not subject to common proof where they had discretion as to their daily work routine); *Perry-Roman*, 2010 WL 8697061 at *3 ("other than holding an identical job title and receiving identical incentives with respect to commissioned sales," defendant's financial advisors shared no common constraints and enjoyed discretion in setting their schedules).

As these authorities show, common questions cannot predominate short of a policy requiring class members to spend a specified amount of time in or out of the office, akin to the hypothetical policy contemplated in *Wells Fargo I* ("a centralized policy requiring employees to be at their desks for 80% of their work day").  571 F.3d at 959.  No such policy is present here.

**D.     Plaintiff's "All-Or-Nothing" Theory Of The Case Fails Under California Law.**

Plaintiff's theory of class certification is that this case presents an all-or-nothing proposition of whether the *BBO job* was misclassified:  "Plaintiff's theory of recovery is that Defendant has misclassified the BBO position as a whole."  Class Cert Mot. (ECF 68-15, pp. 102-120) at 1.[17] This theory is contrary to California law, which makes clear that "jobs" are not properly or improperly classified -- individual employees are.  Cal. Labor Code §§510(a), 515(a),(e).

An exemption policy, standing alone, is inadequate common evidence, and "does [not] eliminate the need to make a factual determination as to whether class members are actually performing similar duties."  *Marlo II*, 639 F.3d. at 948.  Such a policy "may have accurately classified some employees and misclassified others."  *Wells Fargo I* at 959; *Duran*, 59 Cal.4th at 37  ("Liability to one employee is in no way excused or established by the employer's classification of other employees.").  *Duran* expressly rejected Plaintiff's interpretation of the substantive law, reaffirming the standard set forth in *Ramirez* that the employee's actual activities control.  *Duran*,

---

[17] *See also* 2/14/14 Joint CMC Stmnt. (ECF 100) at 7:15-16 ("Plaintiff contends that the only remaining legal issue is whether Defendant properly classified the BBO position as exempt or not."); Class Cert. Reply (ECF 69-22, pp. 1-21) at 3 ("Plaintiff's theory of liability is that Defendant has structured and designed the BBO position such that it can *only* be performed as an inside sales position.") (original emphasis); *see also* 7/29/14 Order (ECF 134) at 2:8-1.

Case No.  CV 09-3111 JSW
MPAs ISO DEF.'s MTN TO DECERTIFY
CLASS

849102.1

1   59 Cal.4th at 26.  Because Plaintiff's principal argument for class treatment directly conflicts with

2   the substantive law, the class should be decertified.

3   **E.    Plaintiff's Theory Of Class Treatment Is Unsupported By The Evidence.**

4          Plaintiff argues that the BBO position is so standardized that determining whether it is

5   performed "inside" or "outside" may easily be resolved on a class-wide basis without

6   individualized inquiries, based solely on "standardized" policies such as training, sales goals, and

7   sales methods.  *See* Class Cert. Reply at 4-5 (ECF 69-22).  This argument failed in *Duran*, and for

8   similar reasons, it fails here.  The BBO position is simply not standardized in a way that allows for

9   class treatment, for four interrelated reasons.

10         First, as in *Duran*, Plaintiff's contention that the BBO position can only be performed as an

11  inside sales job is belied by the plain evidence that many BBOs perform their jobs as outside

12  salespeople.  Here, as in *Duran*, numerous BBOs have testified that they spent the majority of their

13  time outside.[18]  Of these, 37 class members have provided declarations confirming that they are

14  exempt outside salespeople (compared to 11 declarants, including Plaintiff, who testify to the

15  contrary).  Compendium of Evidence 1-37; *see also Duran*, 59 Cal.4th at 14-21 (at least 79 BBOs,

16  including 4 of 6 named plaintiffs, confirmed they were exempt outside salespeople).  Standing

17  alone, this evidence refutes Plaintiff's argument that BBOs can only work as inside salespeople.

18         Second, as Plaintiff admits, this action is a "continuation" of *Duran*, and the duties of BBOs

19  "have not changed in a material way" since *Duran*.  FAC ¶13.  Thus, *Duran's* conclusion that

20  USB's California BBO position was *not* standardized is highly persuasive.  Rejecting the trial

21

22  [18] Baboujian, S. ¶15; Bahadorani, N. ¶¶5, 6, 10; Biggs, B. ¶16; Birnbryer, A. ¶16; Bradley, S. ¶15; Brandt, K. ¶12; Bryan, J. ¶¶4, 10; Carreon, C. ¶7; Chodur, J. ¶14; Corral, S. ¶¶4, 5; Depaola, S.
¶¶5, 15-16; Dias, S. ¶¶8, 21; Difani, D. ¶7; Doughty, D. ¶8; Elia, J. ¶11; Esposito, F. (6/6/02) ¶¶3,

23  6; Forni, G. ¶¶8, 9, 15; Gilman, S. ¶¶3, 11; Graves, J. ¶¶13, 16; Hernandez, B. ¶8; Hwang, Y. ¶¶11-13; Jeske, K. ¶¶12, 14; Jimenez, A. (11/6/09) ¶¶4, 14 ; John, H. ¶¶8, 17; Kaur, K. ¶¶3, 6, 8;

24  Klingman, J. (10/27/09) ¶¶5, 7, 11-12; Labarrere, B. ¶¶9, 12; Lewis, S. ¶14; Lopez, C. ¶¶6-7; Lufti, M. ¶¶8, 20; Maier, W. ¶¶6, 18; Mayle, V. ¶¶4, 5(b); Moulton, C. ¶¶8, 18; Ng, K. ¶10; Pai, J. ¶¶3, 8;

25  Pham, T. ¶4(d); Pizarroso, S. ¶8; Pokuta-Ramirez, K. ¶9; Racusin, E. ¶¶5, 7, 9, 11; Reed, G. ¶¶3, 5; Reynolds, R. ¶¶8, 20; Rissman, B. ¶¶15-16; Roberson, M. ¶8; Robinson, S. ¶¶14-15; Rukhman, D.

26  ¶¶3, 17, 18; Sarip, D. ¶5; Silvestre, J. ¶9; So, S. ¶¶6, 8; Steichen, S. ¶13; Sternad, N. ¶3; Stewart, B. ¶¶4, 8, 13; Summers, R. ¶¶4-5; Tamblyn, P. ¶9; Tobes, A. ¶17; Valdez, B. ¶¶4, 11, 16-17;

27  Vanderford, B. ¶7; Virgil, T. ¶¶10, 14; Vega, C. ¶¶7, 9, 21; Weimer, G. ¶¶3, 18; Wheaton, C. (12/17/04) ¶¶ 6-7 ; Wong, M. ¶¶10, 14.

28

849102.1

1  court's predominance finding, *Duran* held that "[a]t the certification stage, it should have been

2  apparent that litigation of the outside salesperson defense would also involve significant inquiry

3  into how each of the class's 260 members 'actually spen[t] his or her time.'" 59 Cal. 4th at 32.  In

4  view of BBOs' "exceptional independence," and the "significant variation in the time individual

5  BBOs worked outside the office," and the total absence of evidence establishing uniformity in how

6  BBOs spent their time, USB's exemption defense "raised a host of individual issues." *Id.*  Indeed,

7  "the [trial] court's own findings belie[d] any notion of uniformity because it found USB *had* no

8  requirements or expectations regarding where BBOs worked, or how much, so long as they met

9  their sales goals." *Id.* at 37, n.31 (original emphasis).  Given Plaintiff's admission that nothing has

10  changed since *Duran*, these findings further support decertification.

11        Third, the evidence confirms that each *Duran* factor that militated against a finding of

12  predominance -- BBOs' "exceptional independence," the "significant variation in the time

13  individual BBOs worked outside the office," and the total absence of evidence establishing

14  uniformity in how BBOs spent their time -- is also present in this class.  As in *Duran*, class

15  members here have total discretion in how and where they spend each day, and they use varied

16  methods to achieve their sales goals.  *Id.*; *see* Section II.B.3-5, above.

17        Finally, Plaintiff lacks common proof of any uniform policy or practice requiring BBOs to

18  perform their jobs in a nonexempt way.  Absent "a consistently applied policy or uniform job

19  requirements and expectations contrary to a Labor Code exemption," or an employer-encouraged

20  "uniform de facto practice inconsistent with the exemption," class treatment is improper.  *Duran*,

21  59 Cal.4th at 37; *see also Brinker Rest.Corp. v. Sup. Ct.*, 53 Cal.4th 1004, 1003 (Cal. 2012)

22  (certification in wage and hour cases is proper if "a uniform policy consistently applied to a group

23  of employees" exists); *Dukes*, 131 S. Ct. at 2551 ("common" evidence means evidence capable of

24  resolving validity of USB's exemption defense in "one stroke").  No such evidence exists here.

25  **F.**   **Credibility Determinations Will Require Individual Inquiries.**

26        Class treatment is inappropriate for the additional reason that the credibility of each BBO

27  affects the determination of USB's liability.  *Walsh v. Ikon Office Solutions*, 148 Cal.App.4th 1440,

28  1459 (2007) (inconsistent testimony by individual class members about time spent on exempt

849102.1

1   duties "underscores the likelihood that adjudicating the outside salesperson exemption will be best

2   accomplished on an individual basis"); *Jimenez*, 231 F.R.D. at 251-52 (evaluating exemptions

3   "necessarily require inquiries into credibility relating to why certain managers spent more or less

4   time on the various tasks"); *Keller v. Tuesday Morning*, 179 Cal.App.4th 1389, 1399 (2009)

5   (decertification appropriate because of, among other reasons, impeaching deposition testimony by

6   plaintiffs' declarants).  As in those cases, the evidence here makes individualized credibility

7   analyses unavoidable, as (1) certain BBO declarants have offered inconsistent and conflicting

8   testimony as to their exempt status;[19] (2) several of Plaintiff's declarants were investigated and

9   found to have violated key Bank policies, and engaged in concerted falsification of key loan

10  documents to cover up those violations, and have also submitted misleading employment

11  applications, resumes, and other information;[20] and (3) supervisors of Plaintiff's BBO declarants

12  have offered testimony that refutes certain BBOs' testimony about their activities.[21]

13  **G.      The Ancillary "Realistic Expectations" Question Generates Individualized Issues.**

14          Although ancillary to the primary question of how each BBO actually spent his/her time,

15  *Duran*, 59 Cal.4th at 26, questions relating to how each BBO's activities diverged from USB's

16  realistic expectations generate additional individualized issues precluding certification.  Even if a

17  BBO claims to spend most of his or her time inside, that BBO cannot recover if that practice

18  "diverges from [USB's] realistic expectation[]" that BBOs spend a majority of their time outside.

19  20 Cal.4th at 802.  Resolving this question hinges on individualized questions of whether and how

---

20  [19] For example, James Klingman signed two conflicting declarations regarding his exempt status.
    Ex. K (Klingman, J. Dep. Exs. 7-8).  After being presented with his prior contrary declaration
21  confirming his exempt status, Klingman unilaterally left his ongoing deposition.  *Id.* at 150:7-
    151:1, 163:10-164:6, 177:9-180:22.
22  [20] *See* Gediman Dec. ¶17 (Jackson); Wheaton Dec. (3/30/12) ¶14 (Feinner), ¶16 (Richards); Shih
    Dec. ¶11 (Dao); Ex. I (Feinner, D.) 24:4-13, 30:2-43:2, 43:23-44:20; Ex. H (Lo, S.) 141:11-15,
23  142:11-143:2, 148:18-150:3.  If declarants' testimony that they spent a majority of their work time
    sitting in their offices is credited, it suggests they used loan brokers to feed them loans as opposed
24  to going out in the business community to generate their own deals, and used the loan brokers to
    interface with clients/prospects in gathering financial information and data, assessing the business
25  and evaluating collateral and repayment sources – activities that normally would take them outside
    of USB premises. Thus, they were not performing their jobs consistent with requirements and
26  should not be rewarded for their deliberate violation of USB's policies.  *See also* Ex. F (Trahan, J.)
    44:6-45:11, 46:25-48:15, 49:21-51:13, 60:2:-65:2, 66:11-19, 71:11-73:5; Ex. H (Lo, S.) 24:4-25:13.
27  [21] *See, e.g.*, Shih, M. ¶¶9-12 (Dao); Wheaton, C. (3/30/12) ¶14 (Feinner), ¶15 (Watkins), ¶16
    (Richards); Gediman, M. ¶17 (Jackson); Lim, S. ¶¶3-4, 6 (Olberding).
28

849102.1

1  USB's outside time expectation was communicated to individual BBOs, including whether USB

2  counseled individual BBOs who failed to meet that expectation.[22]

3  **H.**     **Administrative And Commission Sales Exemptions Require Individual Inquiries.**

4          Resolving USB's administrative and commission sales exemption defenses also demands a

5  host of individual inquiries.  Applying the administrative exemption turns on individualized

6  questions of how each BBO spent his or her day and whether they exercised discretion and

7  judgment in an exempt manner.  *See Soderstedt v. CBIZ*, 187 Cal.App.4th 133, 148 (2011); *Rix v.*

8  *Lockheed Martin*, 2011 WL 890744, *5-9 (S.D.Cal. Mar. 14, 2011); *Perry v. U.S. Bank*, 2001 WL

9  34920473, *7 (N.D.Cal. Oct. 16, 2001).  At least 30 BBOs have declared that they conduct

10  financial analysis of potential client finances[23]; 20 BBOs advise clients regarding financial

11  products, planning, and strategy[24]; 26 BBOs vary their recommendations according to the

12  customer's needs[25]; 32 BBOs have authority to vary terms of initial loan offers, loans, fees and

13  rates[26]; and at least 6 BBOs advise those clients who do not qualify for credit on how to structure

14

15  [22] *See, e.g.*, Jackson, J. ¶11(ECF 68-19) (told to spend more time outside); Ex. J (Jackson, J.) 114:15-115:5, 150:20-151:21 (same); *id.* at 95:8-96:24, Ex. 5 (received job description); Ex. L (Watkins, M.) 97:12-98:21 & Ex. 2 thereto; Ex. B (Coonley, J.) 146:13-147:19, 149:23-150:7; Ex.
16  A (Biggs, T.) 139:20-141:6 (training re outside time requirement).
    [23] Biggs, B. ¶12; Bradley, S. ¶8; Brandt, K. ¶¶ 7, 8, 11; Carreon, C. ¶14; Dias, S. ¶¶6, 10, 12, 13;
17  Doughty, D. ¶¶ 12, 13; Esposito, F. (6/6/02) ¶5; Jeske, K. ¶8; Jimenez, A. (11/6/09) ¶12; John, H.
    ¶¶ 4, 6; Leverenz, N. ¶9; Lufti, M. ¶12; Maier, W. ¶5; Mayle, V. ¶¶4, 5(a), 5(i); Pham, T. ¶3;
18  Pizarroso, S. ¶7; Pokuta-Ramirez, K. ¶7; Racusin, E. ¶4; Roberson, M. ¶10; Rukhman, D. ¶¶12-13;
    Sarip, D. ¶¶ 6, 7; Sternad, N. ¶5; Tamblyn, P. ¶¶ 10, 13; Tobes, A. ¶12; Weimer, G. ¶10; Wheaton,
19  C. (12/17/04)¶10; Ex. H (Lo, S.) 26:10-20, 88:6-16; Ex. I (Feinner, D.) 93:6-14; Ex. F (Trahan, J.)
    54:24-56:13, 202:24-203:17; Ex. L (Watkins, M.) 106:21-107:4.
20  [24] Brandt, K. ¶11; Corral, S. ¶4; Esposito, F. (6/6/02) ¶¶3, 10 ; Jeske, K. ¶7; John, H. ¶¶4, 13;
    Maier, W. ¶¶3, 14; Mayle, V. ¶¶4, 5(a), 5(j); Ng, K. ¶11; Pham, T. ¶¶3, 4(b), 4(h); Racusin, E. ¶¶4,
21  6; Reed, G. ¶4; Roberson, M. ¶11; Sarip, D. ¶6; Sternad, N. ¶¶3, 10; Tamblyn, P. ¶¶11-12;
    Vanderford, B. ¶4; Weimer, G. ¶8; Wheaton, C. (12/17/04) ¶11; Ex. H (Lo, S.) 30:7-24; Ex. I
22  (Feinner, D.) 93:6-14.
    [25] Biggs, B. ¶12; Birnbryer, A. ¶¶5, 10; Bradley, S. ¶7; Brandt, K. ¶11; Corral, S. ¶9; Dias, S. ¶9;
23  Esposito, F. (6/6/02) ¶¶3,10; Hwang, Y. ¶6; Jeske, K. ¶¶7-8; John, H. ¶¶4, 6, 10, 15; Leverenz, N.
    ¶¶7-8; Lufti, M. ¶¶9, 11; Maier, W. ¶¶4, 11; Mayle, V. ¶¶4, 5(a), 5(i); Moulton, C. ¶¶14-15;
24  Ng, K. ¶11; Pizarroso, S. ¶4; Pham, T. ¶4(h); Racusin, E. ¶¶3, 4; Pokuta-Ramirez, K. ¶¶5-6; Reed,
    G. ¶4; Rukhman, D. ¶12; Sternad, N. ¶10; Tamblyn, P. ¶10; Weimer, G. ¶¶8, 17; Wheaton, C.
25  (12/17/04) ¶11.
    [26] Biggs, B. ¶13; Birnbryer, A. ¶14; Bradley, S. ¶13; Carreon, C. ¶14; Dias, S. ¶14; Doughty, D.
26  ¶14; Esposito, F. (6/6/02) ¶11; Jeske, K. ¶9; Jimenez, A. (11/6/09) ¶12 ; John, H. ¶¶6, 16;
    Leverenz, N. ¶9; Lufti, M. ¶13; Maier, W. ¶17; Mayle, V. ¶5(k); Ng, K. ¶12; Pai, J. ¶6; Pizarroso,
27  S. ¶7; Pham, T. ¶4(h); Racusin, E. ¶4; Pokuta-Ramirez, K. ¶8; Roberson, M. ¶¶ 14-15; Rogers, A.
    ¶10; Rukhman, D. ¶¶12, 14; Sternad, N. ¶11; Tamblyn, P. ¶14; Tobes, A. ¶¶11, 19; Vanderford, B.
28

Case No. CV 09-3111 JSW
MPAs ISO DEF.'s MTN TO DECERTIFY
CLASS

849102.1

their business so that they are able to qualify in the future.[27]  As this evidence suggests, many BBOs spent a majority of their time using their financial acumen and independent judgment to perform administratively exempt tasks for USB and its customers; individualized inquiries are necessary to resolve this question.

Resolving the commission sales exemption similarly turns on individualized questions. USB pays BBOs incentive pay based on the sales they make of various USB products pursuant to a SIP that is updated each year.  Hinrichsen, K. ¶2, Exs. A-C; A. Tsao Dec., Exs. A, B (filed under seal).  The SIPs require BBOs to meet minimum production levels, after which they received incentive pay on loans and fees generated.  A. Tsao Dec., Ex. A at 215:24-216:14, 217:7-219:6; *see also id.* at 212:3-25, 230:21-231:1, 231:7-233:3.  At least 19 class members (including 2 of Plaintiff's declarants) earned the majority of their income from commissions during one or more quarters within the class period.  Hinrichsen, K. ¶4.  Thus, analyzing the commission sales exemption will require analyzing the quarterly earnings of each BBO under one of the five different SIPs in effect during the proposed subclass period, determining whether some or all SIP payments constitute commissions (and, if so, which ones), and then comparing that individual's commissions against salary to determine whether he earned the requisite amount of commissions for that time period.  In sum, applying the administrative and commission exemptions demands in-depth analysis of each individual BBO's activities.

**V.  PLAINTIFF CANNOT MEET THE RULE 23(B)(3) MANAGEABILITY REQUIREMENT.**

**A.  There Is No Way To Safeguard USB's Affirmative Defenses *And* Conduct A Class Trial.**

As underscored by the Court's denial of Plaintiff's survey proposal, Plaintiff's trial plan (which was not before the state court when it certified the class) is unworkable.  As *Duran* emphasized, class certification hinges on the feasibility of a class trial -- as federal courts have long

---

¶¶9-10; Weimer, G. ¶17; Wheaton, C. (12/17/04) ¶15 ; Ex. H (Lo, S.) 51:14-52:3, 112:25-113:16; Ex. K (Klingman, J.) 257:14-24, 258:3-259:12; Ex. F (Trahan, J.) 6:14-58:5, 193:14-22.
[27] Brandt, K. ¶10; Jimenez, A. (5/6/04) ¶12; Leverenz, N. ¶10; Ng, K. ¶12; Roberson, M. ¶11; Rogers, A. ¶9; *see also,* Ex. H (Lo, S.) 26:10-27:25, 28:7-34:8, 115:5-117:3; Ex. A (Biggs, T.) 62:6-63:11, 65:9-20, 74:2-10, 77:7-13, 95:8-96:5, 96:23-97:18; Biggs, T. ¶¶8-15, 17-19.

849102.1

1   held.  *Duran*, 59 Cal.4th at 28-29 (citing *Brinker*, 54 Cal.4th at 1054, Werdegar, J., conc.)

2   ("Whether in a given case affirmative defenses should lead a court to approve or reject certification

3   will hinge on the manageability of any individual issues"); *Zinser v. Accufix Research*, 253 F.3d

4   1180, 1190 (9th Cir. 2001) (affirming denial of certification where plaintiff failed to present a

5   "manageable trial plan adequate to deal with individualized issues"); *In re Paxil Litig.*, 212 F.R.D.

6   539, 548 (C.D. Cal. 2003) ("in the Ninth Circuit, the presentation of a preliminary, unworkable trial

7   plan does not suffice for class certification.").

8          Plaintiff proposes trying this case as follows: (1) an initial "liability" phase would

9   determine "whether USB has improperly classified the BBO position as exempt" based on

10  testimony from a restricted sample of testifying BBOs, (2) a "damages" phase would attempt to

11  determine hours worked, and (3) a "remedial" phase for "claims processing" would determine

12  individual recovery.  Pltf's Trial Plan (ECF 116-1, pp. 20-41) at 5-11.  This plan fails because, as a

13  threshold matter, there is no way to properly select a representative sample of BBOs.  As Plaintiff's

14  expert acknowledged, he cannot conduct a valid survey consistent with survey best practices unless

15  it is confidential and anonymous; as the Court held, such anonymity would compromise USB's

16  right to discovery under the Federal Rules of Civil Procedure.  5th Krosnick Report ¶¶19-33 (ECF

17  135-1); 7/29/14 Order (ECF 134) 4:12-5:10; 8/18/14 Order (ECF 139).  Thus, there is no way to

18  assess variability among the class, short of conducting the deposition of every class member –

19  which renders meaningless the "class" nature of this action.  Hildreth Decl. at ¶¶33-43, 47-48.

20         Setting aside this insurmountable hurdle, the representative sampling plan Plaintiff proposes

21  has no place in the misclassification context, where liability does not depend on the general intent

22  of the employer (unlike, for example, in certain discrimination cases, *see, e.g.*, *Teamsters v. U.S.*,

23  431 U.S. 324 (1977)), but rather, the *actual* activities of each employee.  *Duran*, 59 Cal.4th at 36-

24  37;  *Dukes*, 131 S. Ct. at 2561 (rejecting "trial by formula"; evidence as to one class member does

25  not resolve liability question as to another).  "Any class action trial plan, including those involving

26  statistical methods of proof, must allow the defendant to litigate its affirmative defenses ... If

27  statistical methods are ultimately incompatible with the nature of the plaintiffs' claims or the

28  defendant's defenses, resort to statistical proof may not be appropriate."  *Duran*, 59 Cal.4th at 40.

---

As *Duran* recognizes, no federal court has approved the use of statistical sampling to prove class-wide liability for misclassification under California law. *Id.* at 39. That is because there is no way to extrapolate the testimony of a "representative" witness group to find liability for the entire class because evaluating exemptions like the outside sales and administrative exemptions hinges on each employee's actual activities. As a result, "[a]ny trial would be consumed by individualized inquiries into how each class member spent his or her day, making a class action no better than numerous individual actions." *Wells Fargo II*, 268 F.R.D. at 612-14 (statistical sampling is "of extremely limited help to resolving the key issues," given individualized nature of outside sales inquiry); *Vinole*, 571 F.3d at 947 (rejecting "'innovative procedural tools' such as questionnaires, statistical or sampling evidence, representative testimony, separate judicial or administrative mini-proceedings, expert testimony, etc." where "claims require a fact-intensive, individual analysis of each employee's exempt status"); *Jimenez*, 238 F.R.D. at 253 (C.D. Cal. 2006) (same; recognizing employer's "right to cross-examine each [employee] to determine whether there is liability as to that specific person"); *see Brinker*, 53 Cal.4th at 1054 (Werdegar, J., conc.) ("For purposes of class action manageability, a defense that hinges liability *vel non* on consideration of numerous intricately detailed factual questions, as is sometimes the case in misclassification suits, is different from a defense that raises only one or a few questions and that operates not to extinguish the defendant's liability but only to diminish the amount of a given plaintiff's recovery.").

This case presents the same intractable manageability problems as these authorities. In fact, following *Duran*, Plaintiff has tacitly acknowledged that his trial plan is no longer tenable: "[c]onsistent with *Duran* ... challenges [to the claims of class members outside the proposed sample] should be permitted in the liability phase rather than in a subsequent phase as Plaintiff proposed prior to [*Duran*]." Pltf's Supp'l Survey Mot. Brief re Impact of *Duran* (ECF 120) at 2, n.1. Far from an "inconsequential modification" (*id.* at 6:1-3), this acknowledgment is a concession that class treatment is unmanageable, because Plaintiff's only proposed method for a manageable class trial here has always been to limit testimony to a representative sample of class members. If -- as USB has maintained throughout, and Plaintiff now concedes-- USB must be permitted to challenge the individual claims of BBOs, including those outside the "Representative

1  Witness Group," during the first "liability" phase of trial, then a class trial cannot but devolve into

2  a multitude of individual mini-trials in which each BBO would testify about their individual work

3  habits. Under these circumstances, class treatment is manifestly improper. *Wells Fargo II*, 268

4  F.R.D. at 614; *Jimenez*, 238 F.R.D. at 253.

5  **B.     Class Treatment Is Unmanageable Because Plaintiff Has No Common Evidence.**

6          A second reason a class trial would not be manageable is Plaintiff's fundamental lack of

7  common proof. Plaintiff's trial plan does not cure this problem. Instead, without a common policy

8  or practice resolving the question of whether BBOs are or are not exempt, Plaintiff relies on a plan

9  that essentially uses statistical principles to generate common proof out of thin air. This approach

10  runs afoul of *Duran's* admonition that, "[c]lass actions do not create a requirement of common

11  evidence. Instead, class litigation may be appropriate if the circumstances of a particular case

12  demonstrate that there *is* common evidence." 59 Cal.4th at 36 (original emphasis). "Statistical

13  methods cannot entirely substitute for common proof …. There must be some glue that binds class

14  members together apart from statistical evidence." *Id.* at 31. That "glue" is entirely lacking here.

15  Instead, Plaintiff intends to prove liability by relying on testimony from a "representative" sample

16  of the class. This is not common evidence. Even if the trier of fact concluded that every member

17  of the representative sample group was not exempt, and even if those findings could be treated as

18  scientific "data" to be used for valid extrapolation purposes (a scientifically invalid proposition),

19  the possibility would still remain that other members of the class were properly classified. *See*

20  4/15/13 Hildreth Decl. ¶¶25-32 (varying potential percentages of the putative class may be properly

21  classified depending on percentage of sample that are found to be misclassified). Thus, statistics

22  and sampling can never lead to the conclusion that 100% of the class is misclassified, and as a

23  result, the question of USB's liability cannot be manageably tried on a class basis. *Id.*

24  **VI.  CONCLUSION**

25          For the reasons above, class treatment is inappropriate and the class should be decertified.

26  Dated: September 12, 2014              CAROTHERS DiSANTE & FREUDENBERGER LLP

27                                        By:  /s/ Kent J. Sprinkle
                                                Kent J. Sprinkle
28                                              Attorneys for Defendant
                                                U.S. BANK NATIONAL ASSOCIATION

20

849102.1